<pre>
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3      ------------------------------X
       UNITED STATES OF AMERICA,     :  Case No. 5:17-cr-00200
4                                    :  Cleveland, Ohio
                  Plaintiff,         :
5                                    :
          v.                         :  Monday, June 19, 2017
6                                    :
       CLIFFORD J. MILLER,           :
7                                    :
                  Defendant.         :
8      ------------------------------X
                   TRANSCRIPT OF DETENTION PROCEEDINGS
9              BEFORE THE HONORABLE DAN A. POLSTER
                   UNITED STATES DISTRICT JUDGE
10
       APPEARANCES:
11
       For the Government:     Henry F. DeBaggis,
12                             Assistant United States Attorney
                               208 Federal Building
13                             2 South Main Street
                               Akron, Ohio 44308
14                             330-761-0515
                               henry.debaggis@usdoj.gov
15
       For the Defendant:      Carolyn M. Kucharski
16                             Assistant Federal Public Defender
                               Office of the Federal Public Defender
17                             1660 West 2nd Street, Suite 750
                               Cleveland, Ohio 44113-1454
18                             216-522-4856
                               Carolyn_Kuchaarski@fd.org
19
       For Probation:          Travis Jennings
20
       Official Court          Donnalee Cotone, RMR, CRR, RSA
21     Reporter:               United States District Court
                               801 West Superior Avenue
22                             Court Reporters 7-189
                               Cleveland, OH 44113
23                             (216) 357-7078
                               donnalee_cotone@ohnd.uscourts.gov
24
       Proceedings recorded by mechanical stenography, transcript
25     produced by computer-aided transcription.
</pre>

1          Monday, June 19, 2017 12:46 p.m.

2               DEPUTY CLERK:  All rise.

3               THE COURT:  All right.  Please be seated.

4          All right.  We're here for the detention hearing in

5     U.S. versus Clifford Miller, who is here with

6     Miss Kucharski.  We have Mr. DeBaggis for the government.

7     Mr. Jennings for the probation department.

8          So we're ready to proceed.  So, Mr. DeBaggis.

9               MR. DeBAGGIS:  All right.  The government

10    calls Task Force Officer Gilbride, Michael Gilbride, as a

11    witness.

12               THE COURT:  Okay.  Officer Gilbride.

13               (Witness Sworn.)

14          DIRECT EXAMINATION OF MICHAEL GILBRIDE

15    BY MR. DeBAGGIS:

16    Q.   Sir, please state your full name and spell your last

17    name.

18    A.   Michael Gilbride, spelled G-I-L-B-R-I-D-E.

19    Q.   Where are you employed?

20    A.   City of Akron Police Department.

21    Q.   And how are you employed there?

22    A.   I work in their narcotics unit, and I'm currently

23    detailed to the Drug Enforcement Administration in

24    Cleveland, Ohio, as a task force officer.

25    Q.   Okay.  And how long have you been a task force officer

1    with the DEA?

2    A.    Three years.

3    Q.    During the course of your duties as a task force

4    officer, were you involved in an investigation involving

5    Clifford Miller?

6    A.    Yes, sir.

7    Q.    And was a Title III wire interception a part of that

8    investigation?

9    A.    Yes, it was.

10   Q.    And what year was that?

11   A.    2015.  Approximately August of 2015 through

12   October -- until October of 2015.

13   Q.    And as a result of that investigation, did an

14   indictment -- was an indictment returned in this case?

15   A.    Yes, on June 1st.

16   Q.    And in connection with that indictment, was an arrest

17   warrant issued for Clifford Miller?

18   A.    Yes, sir.

19   Q.    And were you involved in executing that arrest

20   warrant?

21   A.    Yes.

22   Q.    And directing your attention to last Tuesday,

23   June 13th, 2017, what did you or other officers do in

24   connection with executing that arrest warrant?

25   A.    Officers arrived at 1317 Louisiana Avenue, known to be

1    the residence of Mr. Miller.  They knocked on the door.  His

2    wife leaned her head out, asked, May I help you?  They

3    identified themselves, stated that they needed her to answer

4    the door.  Shortly after that Mr. Miller came to the door.

5    He was not wearing any clothing.  He had a towel around his

6    waste.  They escorted him inside the residence, conducted a

7    protective sweep of the house.

8    Q.    Let me stop you for a minute.

9          What did you do to conduct the protective sweep?

10   A.    The officers present at the house checked the rooms

11   make sure -- they were aware that there was one person -- at

12   least one person upstairs, and they were aware based on

13   intercepted conversations of Mr. Miller's phone, that there

14   was a potential of a firearm being present in the home as

15   well.  For their safety, they checked all the rooms of the

16   home; basement, first floor, and the upstairs living room --

17   or the upstairs bedroom.

18   Q.    Okay.  And in connection with the protective sweep,

19   were there items, contraband, that was of interest that you

20   took photographs of?

21   A.    Yes.

22   Q.    All right.  Now, there are a packet of exhibits in

23   front of you.  Directing your attention to Government

24   Exhibit 1A.

25         Can you identify that photograph?

1    A.    A blue used rubber glove and a plastic bag containing

2    an unknown residue.

3    Q.    Okay.  Did you open the bag to inspect what the

4    residue was or test it in any way?

5    A.    It was visually inspected; however, it was not tested.

6    Q.    Why not?

7    A.    Based on intercepted conversations of Mr. Miller's

8    phone, we were aware that he was also selling heroin and

9    fentanyl, as well as controlled purchases of heroin made

10   from Mr. Miller.  We decided not to test it, have it sent

11   out to BCI to have them test it due to their laboratory due

12   to the toxic nature of fentanyl.

13   Q.    So you had some health concerns for you and your

14   fellow officers?

15   A.    Yes, sir.

16   Q.    All right.  Directing your attention to Government

17   Exhibit 1B.

18         Can you identify that photograph?

19   A.    Additional plastic bags of an unknown white powdery

20   residue.

21   Q.    And where were those found?

22   A.    On -- in the basement right next to where the craps

23   table was.

24   Q.    Okay.  1C?

25   A.    NutriBullet grinder.

1    Q.    1D?

2    A.    Second grinder, bullet style.

3    Q.    1E?

4    A.    Plastic sandwich bags.

5    Q.    All right.  Now, as a result of these photographs and

6    other information determined at the time of the protective

7    sweep and the arrest of Mr. Miller, did you prepare an

8    affidavit to search the property at 1317 Louisiana Avenue in

9    Akron, Ohio?

10   A.    Yes.

11   Q.    Directing your attention to Government Exhibit

12   Number 2, can you identify that document?

13   A.    Search warrant type for 1317 Louisiana Avenue.

14   Q.    Was a search warrant executed?

15   A.    Yes, sir.

16   Q.    Was an inventory prepared in connection with the

17   return of the search warrant?

18   A.    Yes.

19   Q.    And directing your attention to pages 2 and 3 of that

20   document, document Exhibit Number 2.

21         Does that itemize the inventory, the items seized at

22   the time of the protective sweep or at the time of the

23   execution of the search warrant?

24   A.    Yes.

25   Q.    Can you, starting with the first item, go through each

1    item and identify what was found and where it was found.

2    A.    Yes.  One Glock Model 23 40-caliber handgun.

3                   THE COURT:  I'm sorry.  I seem to have a

4    different inventory -- oh, I'm sorry.  I was skipping the

5    page.  Okay.

6                   THE WITNESS:  Item 1, Glock Model 23

7    40-caliber handgun with a high capacity magazine containing

8    29 40-caliber bullets.  Item 2 --

9    BY MR. DeBAGGIS:

10   Q.    Just to stop you for a minute.

11         Where was that found?

12   A.    The way the bedroom was situated, there was a box

13   spring or a bed or -- it was just a mattress on the floor.

14   The firearm was recovered on the floor next to the mattress.

15   Q.    And was that a room in which it was determined that

16   Mr. Miller slept?

17   A.    Yes.

18   Q.    And the high capacity magazine, can you describe that;

19   what that is and how that works.

20   A.    That model firearm is designed to carry 10 bullets,

21   high capacity magazine.  It's designed to hold obviously a

22   lot more bullets.  This one held, I belive, 28, plus one in

23   the chamber for 29.  It extends long below the pistol grip,

24   the grip of the firearm.

25   Q.    All right.  And Item Number 2?

1    A.    The electric grinders.

2    Q.    Where were those located?

3    A.    In the basement.

4    Q.    Item Number 3?

5    A.    Miscellaneous baggies with the unknown residue and

6    powdered sugar also found in the basement.

7    Q.    Number 4?

8    A.    Plastic baggie containing 4 grams of marijuana in the

9    living room.

10   Q.    Number 5?

11   A.    Plastic baggie of what was believed to be heroin at

12   the time; however, we were later -- determined to be MDMA,

13   Molly.

14   Q.    And how was that determination made later?

15   A.    Mr. Miller's wife claimed ownership of those -- of the

16   MDMA.  She said it was not heroin.  She said, It's Molly.

17   She was asked how she knew that.  She said because it was

18   hers.

19   Q.    Item Number 6?

20   A.    $290 U.S. currency found in the master bedroom in a

21   box.

22   Q.    Was that found in the box with the Molly?

23   A.    Yes.

24   Q.    Item Number 7?

25   A.    $5,450 cash found in the master bedroom in a pair of

1    men's shorts in the pocket.

2    Q.    And did you determine that those are Mr. Miller's

3    shorts?

4    A.    We determined that they're men's shorts, waist 36,

5    with a male belt buckle.

6    Q.    Item Number 8?

7    A.    One Apple iPhone, master bedroom.

8    Q.    And Item Number 9?

9    A.    Two photos found in the master bedroom.

10    Q.    Clifford Miller, he's seated next to defense counsel

11    today in the courtroom?

12    A.    Yes.

13    Q.    Okay.

14             MR. DeBAGGIS:  I have no further questions at

15    this time, Your Honor.

16             THE COURT:  Thank you.

17        Miss Kucharski.

18             CROSS-EXAMINATION OF MICHAEL GILBRIDE

19    BY MS. KUCHARSKI:

20    Q.    Officer Gilbride, just to be clear, this indictment in

21    the current case, the time frame for that indictment is 2014

22    to 2015, correct?

23    A.    Yes, ma'am.

24    Q.    And your involvement -- you've been involved in this

25    case from the inception?

1   A.   Yes.

2   Q.   All right.  So you were involved in obtaining the wire

3   taps, correct?

4   A.   Yes, ma'am.

5   Q.   And you previously just testified that the wire taps

6   ran from August of 2015 to October of 2015, correct?

7   A.   Yes, ma'am.

8   Q.   Now, you just offered some testimony regarding heroin

9   and fentanyl, correct?

10  A.   Yes, ma'am.

11  Q.   Heroin and fentanyl are not charged in the indictment,

12  correct?

13  A.   Yes, ma'am.

14  Q.   And in your search of the home, there was no heroin or

15  fentanyl that was discovered, correct, to your knowledge?

16  A.   To my knowledge, no.

17  Q.   So, again, what's your information regarding heroin

18  and fentanyl?

19  A.   We purchased it from your client via controlled buys.

20  Q.   And he's not charged with that?

21  A.   Not yet.

22  Q.   And when are you claiming that was done?

23  A.   We made several controlled purchases from both Michael

24  and Clifford Miller of heroin and cocaine beginning in July

25  of 2014.  The last controlled buy was made in August

1    of 2015.

2    Q.    And they are not part of the indictment?

3    A.    The cocaine buys are.  The heroin are not yet.

4    Q.    And this matter was already presented to the Grand

5    Jury, correct?

6    A.    The cocaine conspiracy, yes, not the heroin.

7    Q.    When you went to arrest Mr. Miller, how many officers

8    were present?

9    A.    I was not present as it was executed; however, I would

10   guesstimate roughly 10 to maybe 15.

11   Q.    And there was no information that you learned that

12   Mr. Miller posed any resistance or threats to the officers,

13   correct?

14   A.    He did not.

15   Q.    You had previously mentioned that there was some

16   information that the officers had that there was a weapon in

17   the home?

18   A.    There was potential for a weapon to be present in the

19   home, yes.

20   Q.    And during that protective sweep, no weapon was

21   located, correct?

22   A.    No.

23   Q.    And you're aware that Mrs. Miller, Brittany Miller,

24   is -- or has a CCW license, correct?

25   A.    Unaware of that.  No, I'm not.

1    Q.    Now, are you also aware that Mr. Miller earns a living

2    off tattoo artistry?

3    A.    Yes, I am.

4    Q.    And you're aware that when one gives tattoos,

5    oftentimes they wear rubber gloves, correct?

6    A.    Yes.

7    Q.    And rubber gloves were found in your search, correct?

8    A.    Yes, ma'am.

9    Q.    In fact, I believe one of these exhibits, Government

10   Exhibit 1A is -- has a picture with a rubber glove in it,

11   correct?

12   A.    Yes, ma'am.

13   Q.    And with respect to the pictures that were taken on

14   the day of the arrest, 1A, 1B, 1C, and 1D, and 1E, other

15   than your testimony indicating that there was white residue,

16   you don't know what that residue is, correct?

17   A.    That's correct.

18   Q.    That's been sent to the crime lab?

19   A.    Yes, it has.

20   Q.    And the results have not been returned?

21   A.    Not yet.

22   Q.    But you did not locate any fentanyl or heroin in the

23   house, to your knowledge, correct?

24   A.    That's correct.

25   Q.    The substance that was retrieved when you went back

1    for the search warrant that you indicated that Mrs. Miller

2    took possession of, she told you that that was Molly,

3    correct?

4    A.    Yes.

5    Q.    And she said that that belonged to her?

6    A.    That's correct.

7    Q.    Were you present during the search warrant?

8    A.    Yes.

9    Q.    And that substance was found located within items that

10   were her personal female items, correct?

11   A.    Yes.

12   Q.    So you have no reason to believe that that was not

13   hers?

14   A.    Correct.

15   Q.    And, in fact, Mrs. Miller was given a summons

16   regarding that substance, correct?

17         She has to appear in court for that?

18   A.    Yes.

19   Q.    In state court?

20   A.    Yes.

21   Q.    In the search of the basement, you also located tattoo

22   equipment, correct?

23   A.    It was observed, yes.

24   Q.    And that appears to be the area where Mr. Miller

25   performs his work?

1  A.   Yes.

2  Q.   Now, the firearm that was located during the search

3  warrant, you indicated that that was located in the master

4  bedroom?

5  A.   Yes, ma'am.

6  Q.   Did you find a safe during your search of the

7  residence?

8  A.   Not to my knowledge.

9  Q.   And you indicated that gun was underneath the bed?

10  A.   No, it was next to it.

11  Q.   Next to the bed in a box, is that what you said?

12  A.   No.  It was just laying on the ground.

13  Q.   But it wasn't located during the protective sweep?

14  A.   It was actually located when Mr. Miller -- when they

15  went to go get his clothes.  Again, Mr. Miller answered the

16  door.  He was naked.  He had a towel around his waste.  They

17  asked his wife, Brittany Miller, to retrieve some clothes

18  for him.  She was escorted upstairs to the bedroom area by

19  two officers.  When she got to that room, she was moving

20  around pretty hurriedly trying to find clothes for him.

21  They told her to slow down.  It's not a hurry.  They asked

22  if there was a gun in there.  She said, Yes.  They asked

23  where.  She pointed to the ground next to the bed -- next to

24  the mattress.  That's where it was located.  That's when it

25  was actually recovered.

1    Q.    And she also indicated to the officers that that was

2    her firearm, correct?

3    A.    I'm unaware of that if she did or not.

4    Q.    Was that gun sent for DNA?

5    A.    It's being sent out, yes.

6    Q.    And now in Government's Exhibit 2, the description of

7    the property --

8    A.    Mm-hmm.

9    Q.    -- some of the property that's listed in this receipt

10   inventory is pictured in Government's Exhibit 1, correct?

11   A.    Yes, ma'am.  It would be Items 2 and 3.

12   Q.    Like the grinders, correct?

13   A.    Yes, ma'am.

14   Q.    And the plastic baggies?

15   A.    That's correct.

16   Q.    Now, with respect to the powdered sugar, how did you

17   identify that as powdered sugar?

18   A.    It says powdered sugar on the bag.  It has the same

19   consistency as powder sugar.

20   Q.    So there was no NIC test done on that?

21   A.    No.

22   Q.    And, Officer Gilbride, you've had a chance to review

23   Mr. Miller's criminal history, correct?

24   A.    Yes.

25   Q.    Prior to testifying today?

1    A.    Yes.

2    Q.    And you're aware that his last criminal case was in

3    2007, correct?

4    A.    Yes, ma'am.

5    Q.    And he was placed on federal supervision?

6    A.    Yes.

7    Q.    And you're aware that that federal supervision was

8    terminated successfully, correct?

9    A.    Yes.

10   Q.    So there's been almost a ten-year period of time where

11   he has not been involved in the criminal justice system,

12   correct?

13   A.    Correct.

14   Q.    And, again, this case time frame is from 2014 to 2015?

15   A.    Correct.

16   Q.    And you don't have any information in your file or

17   that you're sitting on that places him dealing drugs after

18   2015, correct?

19   A.    No.

20              MS. KUCHARSKI:  If I can have a moment, Your

21   Honor.

22              THE COURT:  Okay.

23              (Pause in Proceedings.)

24   BY MS. KUCHARSKI:

25   Q.    Officer, with respect to the controlled buys that you

1    mentioned in your testimony, are those audio or video

2    recorded?

3    A.    Yes, both.  Some are audio.  They're all -- strike

4    that.

5         They're all audio.  There are some video.

6              MS. KUCHARSKI:  Nothing further.

7              THE COURT:  Anything on that, Mr. DeBaggis?

8              MR. DeBAGGIS:  No, Your Honor.

9              THE COURT:  Okay.  Thank you.

10         Officer, you may step down.

11              MR. DeBAGGIS:  Your Honor, in addition to the

12    identified Exhibits, 1 [sic] through E and Government

13    Exhibit Number 2, the government would proffer Government

14    Exhibit Number 3, which is a bond revocation and detention

15    order in Case Number 5:07CR69, where at page 2 it indicates

16    that there was a finding that Pretrial Services Officer

17    Niederkofler stated for the record, "The violations

18    committed by the defendant as set forth in his

19    September 6th, 2007 violation report, which outlines

20    defendant's use of narcotic substances from May through

21    June 2007, and his failure to report to the pretrial

22    services office as directed."

23         The government would offer Government Exhibit 3 as

24    well as the pretrial services report with the defendant's

25    criminal history.

1          THE COURT:  All right.  Those items are

2    submitted.

3          MR. DeBAGGIS:  The government has nothing

4    further.

5          THE COURT:  Okay.  All right.  Does the

6    defendant want to put in any evidence or any proffers?

7          MS. KUCHARSKI:  Your Honor, I do have two

8    witnesses to call.

9          THE COURT:  Okay.

10          MS. KUCHARSKI:  The first is Brittany Miller.

11          MR. DeBAGGIS:  Your Honor, the government

12    would move for separation of witnesses.

13          THE COURT:  All right.  Who is the second

14    witness, Miss Kucharski?

15          MS. KUCHARSKI:  His father.

16          THE COURT:  All right.  Yeah, Mr. Miller, if

17    you would go outside, please.  One of the witness rooms

18    should be open, and then we'll bring you in when Ms. Miller

19    finishes.

20          (Witness Sworn.)

21          THE COURT:  All right.  Ma'am, if you could

22    raise your right hand.

23          DIRECT EXAMINATION OF BRITTANY MILLER

24    BY MS. KUCHARSKI:

25    Q.   Can you please state your full name and spell your

1    last name for the court reporter.

2    A.    Brittany Chrisella Miller.  M-I-L-L-E-R.

3    Q.    And, Miss Miller, are you married to Clifford Miller?

4    A.    Yes.

5    Q.    And how long have you two been married?

6    A.    It will be ten years this August.

7    Q.    Do you have any children?

8    A.    Yes.  We have two children.

9    Q.    And how old are they?

10   A.    They're both 13 right now.  My daughter will be 14 in

11   a couple of days.

12   Q.    And do they reside in your home?

13   A.    Yes.

14   Q.    And were you and Mr. Miller, prior to his arrest in

15   this case, were you two residing together?

16   A.    Yes.

17   Q.    And have you always resided together as husband and

18   wife?

19   A.    Yes.

20   Q.    And without stating your address, what city do you

21   reside in?

22   A.    Akron, Ohio.

23   Q.    Did you ever live outside of Akron, Ohio?

24   A.    Briefly I lived in Tennessee.  This was about ten

25   years ago.

1    Q.    Okay.  Was that with Mr. Miller?

2    A.    It was not.  It was when he was actually in prison.  I

3    lived there for about two months, but that's it.

4    Q.    And you two got married when he was released from

5    prison, correct?

6    A.    No.  We were married prior to him going to prison.

7    Q.    Okay.  During the course of your relationship with

8    Mr. Miller, have you always together been within Northeast

9    Ohio?

10   A.    Yes.

11   Q.    And, to your knowledge, does Mr. Miller's family live

12   in Northeast Ohio?

13   A.    Yes.

14   Q.    And can you tell the Court some of the family members

15   that live in Northeast Ohio?

16   A.    Yes.  Pretty much our whole family, his mother,

17   father.  He has two brothers and a sister.  Very close-knit

18   family.  I mean, he has nine uncles -- aunts and uncles, and

19   all their children are really close as well.  So pretty much

20   the whole family.  My whole family as well.

21   Q.    And do they live in the Akron area as well?

22   A.    Yes.

23   Q.    And you said the family sees each other on a regular

24   basis?

25   A.    Yes.

1    Q.    All right.  Now, since your husband's release from

2    prison, how does he make a living?

3    A.    He is very artistic.  He does tattoos.  That's like

4    the bulk of the income.  But he always builds grills.  He

5    does custom artwork like chairs.

6                    THE COURT:  You said he builds grills?

7                    THE WITNESS:  Grills.  Like a grill that you

8    grill on.

9                    THE COURT:  Okay.

10                   THE WITNESS:  Like a barrel grill.

11                   THE COURT:  Okay.

12                   THE WITNESS:  He makes furniture, he details

13   cars.  I mean, he's pretty artistic.  He's pretty handy

14   around the house.  He can pretty much do whatever he puts

15   his mind to.

16   BY MS. KUCHARSKI:

17   Q.    And he is able to make a living and help support the

18   family with that business, correct?

19   A.    Yes, he is.

20   Q.    Now, prior to this hearing, you had sent me a number

21   of photographs regarding your husband's tattoo abilities and

22   also his other artistic abilities, did you not?

23   A.    Yes, I did.

24                   MS. KUCHARSKI:  And, Your Honor, prior to

25   court, I did provide the government with a copy of

1    Defendant's Exhibits A through O, and I also left a copy for

2    the Court with Miss King.

3            May I approach the witness?

4                    THE COURT:  Okay.

5    BY MS. KUCHARSKI:

6    Q.    Miss Miller, are those the photographs that you

7    e-mailed to me?

8    A.    Yes, they are.

9    Q.    And why did you want me to have those?

10   A.    As I told you in the e-mail, I was just trying to

11   paint a picture of my husband.  He is a family guy.  You

12   know, he makes an honest living at home with the kids.  He

13   works out of our home.  Just trying to help the Court see

14   what type of person my husband is.  That's why I provided

15   them for you.

16   Q.    And he does provide financial resources that help

17   support your family, correct?

18   A.    Yes, he does.

19   Q.    And are you employed?

20   A.    I am, yes.

21   Q.    And what do you do?

22   A.    I actually have a radio station and I do credit

23   restoration as well.

24   Q.    So you also contribute financially to the family?

25   A.    Yes.

1    Q.    Is it a situation where you use both of your incomes

2    to make ends meet in the family?

3    A.    Yes.  Absolutely.

4    Q.    Okay.  And without Mr. Miller present doing his

5    artistic tattoos and the other things, would your family

6    suffer financially?

7    A.    Yes, we would.

8    Q.    And are you aware of how long Mr. Miller has lived in

9    the community?

10   A.    Yeah.  He's lived there his whole life.

11   Q.    Do you know if he has a passport?

12   A.    He does not have a passport.

13   Q.    Now, I want to talk to you about some of the items

14   that were found in the home when the law enforcement came

15   and did a search.

16        And you heard the officer testify that he found a

17   brown substance, which initially they listed as heroin?

18   A.    Correct.

19   Q.    And can you tell the Court what you told the officers

20   that day when they discovered that?

21   A.    Well, initially they were pulling money out of the box

22   that I had it in, and I was telling them, like, Hey, that's

23   my money.

24        And, you know, they're like, You don't want this

25   because it has heroin in it.

1    And then I remembered, I said, No, that's mine.

2    That's Molly.  That's not his.  It was in, like you said, my

3    personal items.  I just let them know that it was mine.

4    Q.    What personal items?

5    Like can you describe for the Court where that was

6    located?

7    A.    Yes.  I have a vanity in my room with, like, all my of

8    perfumes and stuff, and it was actually, like, inside of a

9    box that had, like, female items in it.

10   Q.    And how long had that been in the box?

11   A.    We actually went to Vegas in November, and that's when

12   I got it.  Should have threw it away.  Just still had it.  I

13   haven't touched it since then.  I honestly forgot it was

14   there or I would have told the officers when they went

15   upstairs in my room as well, like I told them about the

16   firearm.

17   Q.    And is this a situation where your husband uses Molly?

18   A.    No, it's not.

19   Q.    And are you a regular user of Molly?

20   A.    No.

21   Q.    And that was purchased out in Vegas?

22   A.    Yes.

23   Q.    And you had forgotten about it?

24   A.    Correct.

25   Q.    Now, they also located a firearm in the residence?

1  A.    Correct.

2  Q.    Can you tell the Court who owns that firearm?

3  A.    I own the firearm.

4  Q.    And are you a holder of a CCW license?

5  A.    Yes.

6  Q.    Is there a safe in your home where you store that

7  firearm?

8  A.    It's not actually a safe, but it's a lockbox.  I have

9  a key for it.  I'm the only one with the key.

10  Q.    And do you know where they discovered that firearm on

11  the day of the search warrant?

12  A.    Yes.  It was by my bed.  I was the one that told them

13  where it was.  And it was only by my bed because I heard the

14  knock on the door.  I mean, they were banging pretty hard,

15  and I went and grabbed it.  Then my husband went to answer

16  the door, and I just put it there.  I didn't really think,

17  you know, police were going to come in the house or anything

18  like that.

19  Q.    So you had recently, when you heard the banging,

20  opened the lockbox?

21  A.    Yes.

22  Q.    Prior to that, it was locked and secured?

23  A.    Correct, yes.

24  Q.    And your husband didn't have access to that, correct?

25  A.    No.

1    Q.    Now, with respect to his tattoo business, does he use

2    rubber gloves?

3    A.    Yes.

4    Q.    All right.  And I showed you some of the government's

5    photographs prior to court this morning, correct?

6    A.    Uh-huh.

7    Q.    And those blue rubber gloves, is that what he uses in

8    his tattoo business?

9    A.    He does use rubber gloves.  It's funny, though, he

10   doesn't usually use blue rubber gloves.  So those were

11   actually like the gloves I think that the police had on.  He

12   usually uses either black or plastic gloves.  But, yeah.

13         I mean, we also found some all around the house where

14   they left their gloves.  So I don't really think those --

15   that was his gloves.  But he does use plastic gloves for

16   tattoos.

17   Q.    And there was some marijuana found in the house.  If

18   I'm reading this inventory right, it says 4 grams?

19   A.    Correct.

20   Q.    And who owned that marijuana, if you know?

21   A.    That was mine as well.

22   Q.    All right.  And was that for personal use?

23   A.    Yes.

24   Q.    Do you have a medical marijuana card?

25   A.    No, I don't.

1    Q.    And do you know your husband to smoke marijuana?

2    A.    No, he does not.

3    Q.    And you're aware of your husband's criminal history,

4    correct?

5    A.    Yes.

6    Q.    When he was released off of federal supervision last

7    time, he didn't have any violations while he was on

8    supervision, correct?

9    A.    No, he did not.

10   Q.    Do you ever know him not to appear for court?

11   A.    No.

12   Q.    Do you consider him -- have you ever known him to be

13   violent or dangerous?

14   A.    No, absolutely not.

15   Q.    As far as mental health, do you know whether he's ever

16   been diagnosed with any type of mental health diagnosis?

17   A.    No, not to my knowledge.

18   Q.    And is he able to come back and reside at your

19   residence?

20   A.    Yes.

21              MS. KUCHARSKI:  If I can have a moment, Your

22   Honor.

23              THE COURT:  Okay.

24              MS. KUCHARSKI:  I have nothing further.

25              THE COURT:  Any cross?

1        MR. DeBAGGIS:  Yes, Your Honor.

2        CROSS-EXAMINATION OF BRITTANY MILLER

3   BY MR. DeBAGGIS:

4   Q.   So the Molly, the drugs that were found in the

5   bedroom, that was your Molly; is that right?

6   A.   It was, yes.

7   Q.   And the marijuana was your marijuana?

8   A.   Correct.

9   Q.   And the gun was your gun?

10  A.   Correct.

11  Q.   And you keep the gun secured in a safe?

12  A.   In a lockbox.

13  Q.   Okay.  It was on the floor at the time of the search,

14  though; is that correct?

15  A.   It was, yes.

16  Q.   Yeah.

17       All right.  And it's a Glock, is that the right --

18  A.   Yes.

19  Q.   Yeah.

20       Where did you buy the gun?

21  A.   At a gun show.

22  Q.   And did you buy the extended magazine at the time?

23  A.   I did, yes.

24  Q.   So that morning, the gun had a bullet in the chamber

25  and 28 rounds in the extended magazine?

1    A.    Correct.

2    Q.    Okay.  Why did you need an extended magazine?

3    A.    I didn't -- I don't for sure need one, but, I mean, I

4    do like guns.  Like I said, I have my CCW.  I go to the

5    range and practice shooting.  I didn't need it.  I just had

6    it.

7    Q.    Have you practiced shooting with the extended

8    magazine?

9    A.    Yes.

10   Q.    And have you got off 29 rounds?

11   A.    Yes.

12   Q.    And how long does that take you?

13   A.    About three minutes.

14   Q.    Three minutes?

15   A.    Yeah.

16   Q.    All right.  Where did you buy the Molly?

17   A.    When we were in Vegas.  I bought it from somebody.

18   Q.    Who did you buy it from?

19   A.    I don't know who.  We met somebody out there.

20   Q.    So you took some while you were there and you had some

21   left over?

22   A.    I actually didn't take it while we were there.  I was

23   planning on taking it, but I did not take it.

24   Q.    And then you brought it back on the plane?

25   A.    I did, yeah.  It was in my suitcase.

1    Q.    Okay.  It was in the suitcase that you checked at the
2    airport?
3    A.    Yes.
4    Q.    And you saw the -- I don't know if they're still up
5    there -- Government Exhibits 1 through E?
6    A.    They're not up here, no.
7    Q.    No, they're not.
8          There are a couple of grinders in your house?
9    A.    Mm-hmm.
10   Q.    Were those your grinders?
11   A.    Well, they're our grinders.  We make smoothies all the
12   time.  I have one in my kitchen as well that they didn't
13   touch.
14   Q.    Okay.  Did you ever use the marijuana or use the
15   grinders for the marijuana?
16   A.    No.
17   Q.    Any other drugs?
18   A.    No.
19   Q.    Were there any other drugs in the house?
20   A.    No.
21   Q.    And you're aware that your husband's a prohibited
22   person from being around or having possession of a firearm?
23   A.    I am aware of that, yes.  That's why I had the lockbox
24   for it.
25   Q.    Okay.

1      MR. DeBAGGIS:  No further questions, Your

2   Honor.

3      THE COURT:  Anything on that, Miss Kucharski?

4      REDIRECT EXAMINATION OF BRITTANY MILLER

5   BY MS. KUCHARSKI:

6   Q.   Miss Miller, you took possession -- or told the law

7   enforcement that the gun and the Molly and the marijuana

8   were yours, correct?

9   A.   I did.  And I always told them where it was located as

10  well.  I didn't -- it wasn't recovered.  You know, I told

11  them exactly where it was.

12  Q.   Okay.  And you don't have a criminal history, correct?

13  A.   No, I don't.

14  Q.   And now you've been cited for a drug offense, correct?

15  A.   Correct.

16  Q.   And you need to appear in state court for that?

17  A.   I do, yes.

18  Q.   And you do carry a CCW license?

19  A.   Yes.

20  Q.   And that gun is in a locked box away from your

21  husband, correct?

22  A.   It was, yes.

23  Q.   And you are the only person who has the key?

24  A.   Yes.

25      MS. KUCHARSKI:  Nothing further.

1       THE COURT:  Okay.  You may step down then.

2          All right.  Now, we can have Mr. Miller.

3          Sir, if you can raise your right hand.

4              (Witness Sworn.)

5          DEPUTY CLERK:  You can go ahead and have a

6   seat.

7              DIRECT EXAMINATION OF CLIFFORD E. MILLER

8   BY MS. KUCHARSKI:

9   Q.   Mr. Miller, can you state your full name and spell

10  your last name for the Court.

11  A.   Clifford Eugene Miller, M-I-L-L-E-R.

12  Q.   And what city do you reside in Mr. Miller?

13  A.   Akron, Ohio.

14  Q.   All right.  And is Clifford, who is sitting at trial

15  table over here, is this your son?

16  A.   Yes.

17  Q.   How many children do you have?

18  A.   Four.

19  Q.   Do they all reside in the Northeast Ohio area?

20  A.   Yes.  One daughter is in Columbus.

21  Q.   Okay.  But she's still in Ohio, correct?

22  A.   Right.

23  Q.   Would you consider your family a close-knit family?

24  A.   Yes.

25  Q.   And are you here today in court because you support

1  your son, Clifford?

2  A.    Yes.

3  Q.    And what's your contact like with Clifford and his

4  family?

5        How often do you see them?

6  A.    Four to five times a week.

7  Q.    And can you tell the Court what type of father your

8  son is?

9  A.    Too nice.

10  Q.    Too nice?

11  A.    Not being funny.  But, yeah, trusting, caring.

12  Q.    And are you aware of whether or not he financially

13  supports his family?

14  A.    And most people he knows.

15  Q.    And you've heard -- well, you didn't hear actually

16  because you weren't in court.

17        Do you know what your son does to help support his

18  family?

19  A.    Can I elaborate?

20  Q.    Yes.  Do you know whether or not he gives tattoos?

21                MR. DeBAGGIS:  Objection.

22                THE WITNESS:  Anything with his hands.

23                THE COURT:  Hold it.  What is -- the question

24  is, do you know what your son does to support his family?

25                THE WITNESS:  Yes.

1                    THE COURT:  All right.  Do you know what your

2       son does to support his family?

3                    THE WITNESS:  Yes.

4                    THE COURT:  Okay.  You can answer.

5            Objection overruled.

6       BY MS. KUCHARSKI:

7       Q.    What does he do?  What are the types of things he

8       does?

9       A.    He's a carpenter.  He makes custom furniture, details,

10      paints cars, tattoos.  I mean, I could go on and on, but,

11      yes.

12      Q.    He's a pretty handy artistic guy?

13      A.    Bred with his hands, unlike any I know.

14      Q.    And, sir, can you tell the Court who else is present

15      today from your family here in support of your son?

16      A.    My youngest son, my sister-in-law, my niece from

17      Houston, my wife -- I should have said her first -- and his

18      brother, I thought.

19      Q.    And you're aware that your son had some legal

20      problems --

21      A.    Yes.

22      Q.    -- more than ten years ago, correct?

23      A.    Yes.

24      Q.    All right.  And when he had those legal problems, did

25      you ever know him not to appear at court?

1    A.    No.

2    Q.    He always showed up, correct?

3    A.    Right.

4    Q.    And he knew that he always had his family there to

5    support him, correct?

6    A.    Exactly.

7    Q.    And are you still there standing by him while this

8    case is going to be pending?

9    A.    Yes, I am.  I don't understand all this, but, yes, I'm

10   standing by him.

11   Q.    Okay.

12              MS. KUCHARSKI:  I have nothing further, Your

13   Honor.

14              THE COURT:  Okay.  Any cross-examination?

15         CROSS-EXAMINATION OF CLIFFORD E. MILLER

16   BY MR. DeBAGGIS:

17   Q.    And, sir, did you ever know your son not to report to

18   pretrial services when he had his other case?

19   A.    No.

20   Q.    Okay.  And did you ever know him not to use drugs for

21   two months while the other case was pending?

22   A.    Say that again.

23   Q.    Did you ever know your son not to use drugs, to use

24   illegal drugs, while he was on supervision on that other

25   federal case that he had?

1    A.    I'm not sure I understand.  Did I ever know him not to

2    use drugs?

3    Q.    Yes.  Did he use drugs while he was on bond in the

4    other case?

5    A.    I never was close enough to know that.  They knew I

6    wouldn't permit that.

7    Q.    Okay.  Thank you.

8                    MR. DeBAGGIS:  That's all I have.

9                    THE COURT:  Okay.  Anything on that?

10                   MS. KUCHARSKI:  I have nothing further, Your

11   Honor.

12                   THE COURT:  Thank you, Mr. Miller.  You may

13   step down.

14        Okay.  I take it those were your two witnesses,

15   Miss Kucharski?

16                   MS. KUCHARSKI:  That's correct, Your Honor.

17                   THE COURT:  Okay.  Anything you want to

18   proffer?

19                   MS. KUCHARSKI:  Your Honor, we would just ask

20   that the Court consider the exhibits that we presented.

21                   THE COURT:  Okay.  Well, all the exhibits from

22   both sides are admitted.

23                   MS. KUCHARSKI:  And then we would like to be

24   heard with respect to argument.

25                   THE COURT:  Okay.  Well, I guess I'll have

1    argument now.

2          Mr. DeBaggis, it's your motion, so you should go

3    first.

4                MR. DeBAGGIS:  Your Honor, based on the

5    defendant's criminal history, which includes a 2003

6    conviction for trafficking in cocaine, marijuana, a

7    trafficking conviction in 2007, and given the nature and

8    circumstances relative to this arrest, which involved

9    arresting the defendant at his residence when he was in

10   constructive possession, anyway, of this firearm that had an

11   extended magazine containing 29 rounds, and also extensive

12   paraphernalia in the basement area of the residence, and

13   given the fact that, as set forth in Government Exhibit

14   Number 3, that prior, when he was given bond in the 2007

15   federal felon in possession of a firearm case, he violated

16   his supervision by using drugs for two months and failing to

17   report to pretrial services.

18         So the government believes, given all these factors,

19   that detention is appropriate in this case.  Not to mention

20   the fact that his prior trafficking offenses qualify him for

21   an 851 enhancement, which would elevate the minimum

22   mandatory penalty from five years to ten years to life in

23   prison.

24         So given all those factors, but especially the

25   circumstances of his living situation at the time of his

1    arrest and the firearm that was found at the time of his

2    arrest, the government believes that detention is

3    appropriate.

4              THE COURT:  All right.  Just so the record is

5    clear, the defendant on the present indictment is facing a

6    minimum mandatory of five years.  He has two prior drug

7    trafficking convictions.  So the government could file one

8    or two enhancements, but it hasn't yet, right?

9              MR. DeBAGGIS:  Correct.

10             THE COURT:  Okay.

11        Okay.  Thank you.

12        All right.  Miss Kucharski.

13             MS. KUCHARSKI:  Thank you, Your Honor.

14        Your Honor, I'd just like to start off by saying that

15   pretrial services did a bond assessment on Mr. Miller, which

16   concluded that he was an appropriate candidate for bond, and

17   that is a part of the pretrial services report, so we would

18   ask the Court to take that into consideration.

19        I'd also ask the Court to take into consideration the

20   fact that there are three people listed on this indictment,

21   one of which is Mr. Miller's brother, and the government had

22   no problem agreeing to a bond in his case.

23        So those two things aside, if the Court then looks at

24   the facts and circumstances of the case, this is a case that

25   was recently indicted for conduct occurring between 2014 and

1    2015.  So approximately two years ago.

2        For two years, the government and law enforcement

3    obviously didn't consider Mr. Miller a serious risk to the

4    community because they certainly weren't going out and

5    arresting him right away based on that conduct.

6        I find it extremely offensive that law enforcement got

7    up on the stand and testified about heroin and fentanyl when

8    heroin and fentanyl aren't even a part of this indictment.

9    So I'd ask the Court to disregard those statements.

10        With respect to Government's Exhibit 1, law

11    enforcement also got up and testified that they found

12    residue on items that they recovered.  We don't have a lab

13    report currently at this time.  We don't know what, if any,

14    residue was on any of those items.

15        But if the Court looks in those photographs, I don't

16    even see residue.  I see what looks like plastic wrap and

17    maybe a blue glove wadded up.  Now, we know Mrs. Miller

18    testified that he doesn't even use blue gloves.  So I'm

19    questioning whether those gloves are those of law

20    enforcement or not.

21        The other facts that the Court has to consider -- and

22    the facts and circumstances, by the way, of the indictment,

23    the indictment is probable cause.  I can see that.  But

24    that's one factor for the Court to consider, and that factor

25    is not to weigh any more heavily than the other factors in

1    this case.

2         And the other factors that the Court has to rely upon

3    are the physical and mental condition of Mr. Miller.  Well,

4    we know that he's healthy.  We know that he suffers from no

5    mental health issues.  We know that he has significant

6    family ties in the community.  He's got the support of his

7    family.  Most of his family is here present today for him.

8    He is a financial resource for his family.  He has two

9    children under the age of 18.  He makes his living as a

10   tattoo artist, also as a handyman.  He builds furniture.

11   And we did provide exhibits for the Court to consider in

12   that regard.

13        We know that he's been a resident of Northeast Ohio

14   his entire life.  He does have some prior criminal history,

15   but, again, if the Court looks at his criminal history, that

16   criminal history dates back ten years, back to 2007.  He

17   successfully completed his stint on federal supervised

18   release once he was released from prison.  So there's not

19   even a violation.

20        The violation that the government wants to hang its

21   hat on is from 2007, and they keep indicating to the Court

22   that it was a period of two months of drug use.  That's not

23   what the report says.  It says that there was drug use.  It

24   doesn't even detail in this report what the item was or what

25   the drug was that was used.

1     So I don't know whether it was a prescription

2  medication that he tested positive for and maybe the

3  prescription wasn't his.  We don't know that based on this

4  report.

5     But we do know that once he went to prison for that

6  offense, he got out, he followed the conditions of

7  supervised release, and he didn't violate it.  We know that

8  he's not a violent individual.  He's got no violence on his

9  criminal record.  He's not a danger to the community.

10     So the government has no information to suggest to

11  this Court that Mr. Miller is a danger to not appear for

12  court.  He's always shown up for court.  There's never been

13  one instance where he didn't show up for court.  He even

14  showed up when he went for his bond violation report.

15     So there's no information to suggest that he's not

16  going to appear for court in this instance.  There's no

17  information to suggest that he's a danger to the community

18  or that he's violent or that he's some type of threat to a

19  witness in this case.

20     There are conditions and combinations of conditions

21  that the Court can put in place to feel comfortable.

22  Pretrial felt comfortable recommending a bond for this

23  individual.

24     So based on all of these things, Your Honor, we are

25  asking the Court to grant Mr. Miller a bond in this matter.

1    He's more than willing to comply with any conditions that

2    the Court deems appropriate.

3         Thank you.

4              THE COURT:  All right.  The Court has listened

5    carefully to the testimony and the documents and the

6    proffer.  The government has the burden of proving by a

7    preponderance of the evidence that there are no conditions

8    or combination of conditions that will both secure

9    Mr. Miller's appearance and protect the community.

10        I really haven't heard much evidence to suggest that

11   Mr. Miller is not likely to appear other than the fact that

12   he is facing a lengthy prison sentence.  But there's no

13   evidence from his prior court matters that he did not

14   appear.  So I don't think he's a significant flight risk.

15        These are serious charges, but I think there are some

16   combination of conditions that can protect the community.  I

17   am somewhat troubled by the gun, and that gun -- that gun is

18   going to be removed from the home.

19             MS. KUCHARSKI:  It is already removed, Your

20   Honor.

21             THE COURT:  The fact is that it should not

22   have been there, because, Mr. Miller, you knew that you

23   couldn't have a gun anywhere near you.

24        What I'm going to do is place you on home detention

25   with electronic monitoring.  You'll stay in custody until

1    that's in place, and you have work release privileges.

2          Although, I understand most of your work is from your

3    home; is that right?

4                    THE DEFENDANT:  Yes, sir.

5                    THE COURT:  I mean, did you actually -- I

6    didn't hear testimony that you actually work outside your

7    home.

8                    THE DEFENDANT:  No, I don't.

9                    THE COURT:  All right.  Well, you'll be

10   allowed, if you do some of the work in your garage --

11   obviously, you're not going to be doing automobile detailing

12   inside your house, but I'll count, you know, the garage as

13   part of your home.  And you can leave your home to,

14   obviously, come to court, to meet with Miss Kucharski.  But

15   if you're going to meet with her, you need to let the

16   pretrial services know that on such and such a day at 1:00,

17   I've got a meeting with my lawyer, and so you'll be released

18   to go there, meet with her and come back.  But you can't

19   just go wandering around.  Obviously, you can get medical

20   treatment if you need that.  But anything else, you've got

21   to get advanced permission.  You can't just go wondering

22   around and then hope to fix it when you're done.

23         Do you understand that?

24                    THE DEFENDANT:  Yes, sir.

25                    THE COURT:  All right.  So there will be some

1    paperwork.  It will be $20,000 unsecured with the home

2    detention.  So you'll fill out some paperwork.

3         And, again, I'm giving you a break.  If there are any

4    problems, bond is going to be revoked and you'll just have

5    to stay in jail until the case is resolved.

6         Do you understand that?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  I'm doing that because it's a big

9    handicap to be in custody and have to prepare for trial.

10   It's not impossible, but we do it as a last resort, and

11   I'm -- again, your convictions are old and there isn't any

12   evidence that you did not come to court when you were

13   supposed to.  And it does appear that the gun was

14   your -- was your wife's.

15        So this is what I'll do.  Obviously, all the other

16   dates that we set in place are -- stay on the calendar.  So

17   trial is August 14th, 9:00.  Final pretrial, August the 3rd

18   at 12:30 p.m., and a pretrial change of plea, July 24th the

19   1:00.

20        Although, I do note that we still haven't had any word

21   as to the third defendant, Mr. Perdue.

22        Do we know anything about him?

23                   MR. DeBAGGIS:  The government was notified

24   last week that he was arrested and detained in California,

25   and it's my understanding that he's going to be transported

1    back to this jurisdiction.

2              THE COURT:  Okay.  Fine.  Thank you,

3    Mr. DeBaggis.

4              MR. DeBAGGIS:  Okay.

5              THE COURT:  Okay.  Anything further to take up

6    from the government or the defendant?

7              MR. DeBAGGIS:  No, Your Honor.

8              MS. KUCHARSKI:  Your Honor, the only thing

9    that I would bring to the Court's attention is, one of the

10   conditions is that he avoid all contact with codefendants.

11   One of the codefendants is his brother --

12             THE COURT:  All right.  Well, obviously --

13   that's a good point, Miss Kucharski.

14        You can't have any contact with Mr. Perdue when he

15   gets back here, but, obviously, you know, you live with your

16   wife.  So that condition doesn't apply to your wife,

17   Mr. Miller.

18        Okay.  Thank you.

19             MS. KUCHARSKI:  Thank you, Your Honor.

20             THE COURT:  We're adjourned then.

21             DEPUTY CLERK:  All rise.

22                        - - -

23             (Proceedings adjourned at 1:43 p.m.)

24

25

1    **C E R T I F I C A T E**

2

3        I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    */s/ Donnalee Cotone*                    *20th of July, 2017*
     DONNALEE COTONE, RMR, CRR, RSA                    DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25